Elizabeth Schaffner, Appellee, v. The Equitable Life Assurance Society of the United States, Appellant.

Gen. No. 39,174.

Opinion filed May 4, 1937.

MAYER, MEYER, AUSTRIAN & PLATT, of Chicago, for appellant; FREDERIC BURNHAM and MILES G. SEELEY, both of Chicago, of counsel.

NATHAN SCHWARTZ and BERNARD ALLEN FRIED, both of Chicago, for appellee.

MR. JUSTICE FRIEND delivered the opinion of the court.

Elizabeth Schaffner brought an action in assumpsit against Equitable Life Assurance Society of the United States to recover $1,000, as beneficiary under the double indemnity provisions of a life insurance policy issued by defendant on the life of Louis M. Schaffner.

The cause was heard by the court without a jury, resulting in findings and judgment for plaintiff of $1,100. Defendant appealed.

Following Schaffner's death defendant paid plaintiff $1,000, but refused to pay the additional $1,000 of insurance claimed under the following provisions of the policy:

"The increased amount of insurance, as stipulated on the face hereof, in case of accidental death shall be payable upon the receipt of due proof that the death of the insured occurred while this policy was in full force and effect and resulted solely from bodily injuries caused directly, exclusively and independently of all other causes by external, violent and purely accidental means, *providing that death . . . shall not be the result of or be caused directly or indirectly by . . . any violation of law by the insured.*" (Italics ours.)

Schaffner was shot and killed by a railroad police officer June 14, 1935, and died at the Bridewell hospital three days later. Upon trial of this cause plaintiff made a prima facie case by putting in evidence the policy and a statement of the coroner's physician that he had performed a post mortem on the body of Louis M. Schaffner, which had been identified by Schaffner's wife, and that in his opinion death resulted from a "bullet wound of the back with lacerations of the spinal cord."

To show the circumstances leading up to Schaffner's death, as a basis for the defense that his death occurred as the result of the violation of one or more laws, and that his beneficiary was therefore not entitled to the increased insurance under the double indemnity provisions of the policy, defendant first introduced a blueprint plan of the elevated railroad tracks and environs at the intersection of Morgan street and 15th place, in Chicago, and called one Thelander, division engineer of the C. & N. W. Railway to explain

the plan. It shows that Morgan street runs in a northerly and southerly direction. The railroad tracks which intersect it are elevated some 18 feet above the ground, the northerly group of tracks being those of the C. & N. W. Railway, while those of the south belong to the C. B. & Q. Railroad. 15th place lies parallel and adjacent on the north to the C. & N. W. right of way. At the northeast corner of the intersection of Morgan street and the tracks is the Griswold & Walker warehouse, having an elevated platform adjacent to the tracks along the south side.

Following the Thelander testimony, defendant called Harry F. Brooks, a sergeant of police commissioned and under bond to the City of Chicago as a special policeman, but drawing his wages from the C. & N. W. Railway. Brooks was employed to patrol the yards and protect the merchandise cars at 15th place and Morgan street during the night. He testified that June 14, 1935, at about 10:30 p. m., while standing at the "shanty" along the right of way, he saw two men on the C. B. & Q. tracks to the east and south of him. They walked north across those tracks and on to the C. & N. W. right of way. Brooks walked from the shanty east on the tracks to the Griswold & Walker warehouse where he found the men standing in the door nearest Morgan street. He approached them with his star in his hand and advised them that he was a police officer, and asked what they were doing. They said they were waiting for a train for Boston. The men were later known to Brooks as Joe Franks and Cecil Smith, "Franks" being Louis M. Schaffner, the deceased. Brooks drew his revolver and ordered the men down from the platform. He observed that they were well dressed, with white Panama hats and laundered shirts. Brooks asked them if they had any identification, and they had none. He thereupon placed them under arrest, and ordered them to the shanty,

which was a small building on the south side along the tracks, containing two rooms divided by partition and door. The entrance to the shanty was through the east room. Upon proceeding through the door into the west room with the two men, Brooks called the police and requested a squad car, and then searched Smith and found no identification. He then took the hat from Frank's head, and on the band found the inscription "Jack Bell, Plaza Hotel, Hollywood, California." While holding the hat Brooks turned to a desk to copy the name and legend in the hat band, and as he did so Smith picked up a tacking machine and threw it at Brook's head, at the same time crying out "Give it to the son-of-a-B, Joe." As Brooks raised his left arm to guard his head the tacking machine hit him on the arm and glanced through the window out on to the tracks. At the same time Smith ran out the door. Brooks testified that Franks thereupon jumped from his chair, reached as if to draw a weapon from his right hip pocket, and lunged toward Brooks. Believing that Franks had a gun, and fearing for his life, Brooks fired two shots in rapid succession. Franks fell to the floor, was later taken to the Bridewell hospital, and died two or three days later. The evidence further shows that no gun was found on deceased's person, either before or after death.

Based upon the report of the coroner's physician Dr. Harry E. Mock, a qualified physician and surgeon called on behalf of defendant, stated that the bullet which struck Schaffner (or Franks) entered the back just below the point of the left shoulder blade, about 8 inches below the coat collar and slightly more than three inches to the left of the spine. It there fractured the sixth rib, then pursued a course slightly downward and to the right, fracturing the laminae and spines of the seventh and eighth vertebrae at a depth of about $2\frac{1}{2}$ inches beneath the skin, damaging the right pleura,

passing through and fracturing the eighth rib on the right side and lodging outside the eighth rib in a muscle about 5½ inches to the right of the spine. One of the bullets fired by Brooks lodged in the sash of the window directly behind the chair from which Schaffner had risen.

Thomas F. O'Brien and Frank Rowder, two Chicago policemen called on behalf of defendant, testified that about 3:15 a. m. June 15, 1935, they found a closed car, with the doors locked, in front of 1622 South Halsted street, bearing Illinois license No. 518–286. Upon opening the car they found two jimmy bars, a flashlight, a bar of laundry soap, a chisel and a pair of leather gloves, and officer O'Brien stated that such articles were the kind ordinarily used as burglary tools. Defendant also introduced in evidence a certified copy of an application for an automobile license, signed by Louis M. Schaffner, showing that Illinois license No. 518–286 had been issued to him for the year 1935.

It is urged that Schaffner came to his death "as the result of" and "directly or indirectly" because of one or more violations of law, including a conspiracy to commit robbery or burglary, trespass upon elevated railroad tracks contrary to law, assault, assault with a deadly weapon and aiding or attempting to aid another to escape from lawful arrest. To sustain the contention that Smith and Schaffner had entered upon the railroad right of way in pursuance of the conspiracy to commit robbery or burglary, defendant's counsel made the following offer of proof, which was objected to by plaintiff and sustained by the court:

That Captain Norton of the Chicago Police Department and two police officers had a conversation with Schaffner on June 15, 1935, shortly before his death, wherein Schaffner stated that he felt very weak and was sure he was going to die of the wounds inflicted; that Norton asked him how he came to be shot, and

Schaffner replied that in the early evening of June 14, 1935, he had encountered on Halsted street a man known to him as Cecil Smith, who told him that he was going "to look over a job." Captain Norton asked Schaffner if by that he meant that he was going to look over some premises for the purpose of burglarizing them, and Schaffner said "yes." Schaffner said that he then accompanied Smith to the neighborhood of Morgan street and 15th place in Chicago, and on the way over Smith told him that arrangements had been made with the watchman in the Griswold & Walker warehouse at the corner of the Northwestern tracks and Morgan street to leave the door of the warehouse ajar when he went out for supper, about 11:00 o'clock that night, so that Smith and Schaffner might enter; that Schaffner said he accompanied Smith upon the elevated embankment and they crossed the tracks at or near Morgan street, went to the door of the Griswold & Walker warehouse and were standing there waiting for the watchman to go to supper when they were accosted by Brooks, placed under arrest and taken to the shanty nearby; that Schaffner said to Captain Norton that if he had had a gun he never would have gone to the shanty with Brooks, but would have killed him at that time; that Schaffner admitted ownership of the automobile bearing Illinois license No. 518–286, which was found near the scene of the shooting, admitted that the burglary tools found in the car belonged to him.

The foregoing proof was offered upon the theory that where the right is reserved to insured to make a change of beneficiary, and the latter has no vested interest in the insurance contract, any admissions against interest of insured are admissible in an action brought by the beneficiary. It is argued that, if admitted, this evidence would have tended to prove that Schaffner was the owner of burglary tools found in his car, that

he had committed other crimes in the chain of events which led to his death, and that he admitted conspiring with Smith to rob the Griswold & Walker warehouse on this particular occasion, and such conspiracy, coupled with the overt act of actually going upon the premises to be robbed, constituted a crime under sec. 46, par. 116 of the Criminal Code (ch. 38, Illinois State Bar Stats. 1935; Jones Ill. Stats. Ann. 37.102). A discussion of the foregoing rule of evidence relating to admissions against interest is contained in 86 A. L. R. Annotated, 160 *et seq.*, and the cases cited therein, both from Illinois and other States, sustain defendant's contention that the offer of proof was erroneously rejected. In *Wirthlin v. Mutual Life Ins. Co.*, 56 F. (2d) 137, it was held that declarations of the insured under a policy providing for double indemnity in case of death by accident, that he had shot himself with suicidal intent, such declarations being corroborated by circumstances, were competent evidence against the beneficiary, where, by reason of reservation to the insured of the right to change the beneficiary, the latter had no vested title to the insurance money.

In *Benefit Ass'n of Ry. Employees v. Armbruster*, 221 Ala. 399, 129 So. 78, a statement by an appendicitis patient that he was not hurt when the ambulance, in which he was being taken to the hospital for an operation, jerked violently, was admitted in evidence against the beneficiary, who did not have a vested interest in his insurance, to disprove an allegation that the jerk caused the rupture of the appendix and resulted in his death. In *Brown v. Mystic Workers,* 151 Ill. App. 517, it was held that the statements of one insured under a mutual benefit policy, to the effect that she had taken pills to cause an abortion, were admissible, death in fact resulting from an abortion, regardless of the question of *res gestae,* since, the beneficiary, having no vested interest, the declarations were against

interest. Statements of the insured in a similar policy concerning her pregnancy and an abortion which resulted in her death were likewise admitted in evidence against the beneficiary in *Lundholm v. Mystic Workers,* 164 Ill. App. 472. In *Gilchrist v. Mystic Workers,* 188 Mich. 466, in a suit on a fraternal benefit life policy, the testimony of the nurse as to an admission by the insured that an abortion, which was a breach of the policy, was the cause of her last sickness, was held admissible, the court saying that the beneficiary could recover only according to the contract which the insured had made with the society, and that, if the insured admitted a breach of the policy which would void it, the beneficiary ought not to recover. In *Treat v. Merchants' Life Ass'n,* 198 Ill. 431, suit was brought by the beneficiary of a life insurance policy and the issue was whether the insured had committed suicide, which would have precluded recovery. It was held that the trial court erred in not permitting a witness to testify that, after signing the application for the policy, the insured had asked whether the company paid losses on suicides, thus possibly indicating that he had suicide in mind at the time.

Plaintiff's counsel seek to justify the exclusion of this proffered testimony on the ground that Schaffner's statements were not admissible, either as dying declarations or as part of the *res gestae.* They were not offered upon either of these theories, but solely as admissions against the interest of the insured.

It is argued by plaintiff's counsel that Schaffner's statements to Norton in the presence of other witnesses with reference to the contemplated robbery or burglary were purely hearsay, being based upon plans disclosed to him by Cecil Smith. However, we think these statements tended to prove admissions made by Schaffner that he had entered into a conspiracy with Smith to rob or burglarize the warehouse, and that he accom-

panied Smith over the railroad right of way in pursuance of that conspiracy. The statements tended to disclose his state of mind, and that he had agreed with Smith to engage in the unlawful enterprise and had actually embarked upon their joint unlawful mission. Having so conspired with Smith, Schaffner would be equally guilty with his fellow conspirator of any collateral crimes committed by the latter in assaulting Brooks and escaping from arrest. (*People v. Payne,* 359 Ill. 246.)

Defendant's counsel earnestly argue that Schaffner violated the law in trespassing on the railroad right of way, that he committed an assault upon Brooks, and that he aided or attempted to aid in the escape of Smith from lawful arrest, and that any one or all of these violations constituted an unbroken chain of circumstances resulting in Schaffner's death, so as to preclude recovery under the double indemnity provisions of the policy. Inasmuch as the cause will have to be retried, we refrain from unnecessary comment upon the evidence pertaining to the assault and Smith's escape. Defendant's ability to sustain by competent evidence the conspiracy to rob or burglarize may have a material bearing upon the interpretation to be placed upon the acts of Schaffner in connection with the other charges of law violation. For the reasons stated herein the judgment of the circuit court is reversed and the cause is remanded for a new trial.

*Reversed and remanded.*

John J. Sullivan, P. J., and Scanlan, J., concur.